IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARJAM SUPPLY CO.** | : CIVIL ACTION |
| v. | : |
| **BCT WALLS & CEILINGS, INC. AND BERNARD C. TORDA, JR.** | : NO. 02-CV-2890 |

### MEMORANDUM AND ORDER

**Norma L. Shapiro, S.J.**                                              June 26, 2003

Marjam Supply Co. ("Marjam") brings this action to recover goods sold to defendant BCT Walls & Ceilings, Inc. ("BCT"), a subcontractor for three construction projects. BCT ordered various products needed to perform its subcontracts from Marjam. Marjam claims that it has not been paid for the goods it provided to BCT for these projects. BCT responds it is relieved from its obligation to pay Marjam, because the goods Marjam supplied did not conform to the specifications, and counterclaims for damages caused by the non-conformity. The action is governed by Article 2 of the Uniform Commercial Code ("UCC") because it involves the sale of goods. U.C.C. § 2-102 (1977).

### FINDINGS OF FACT

1. Plaintiff, Marjam Supply Co., is a New York corporation with a principal place of business at 885 Conklin Street, Farmingdale, NY 11735.

2. Marjam is in the business of supplying building materials to contractors.

3. Defendant, BCT Walls & Ceilings, Inc. is a Pennsylvania corporation with a principal place of business at 2578 Maple Avenue, Feasterville, PA 19053.

4. Individual defendant, Bernard C. Torda, Jr., BCT's owner, is a resident of Pennsylvania.

5. BCT is a subcontractor engaged in the business of constructing both interior and exterior walls and ceilings, generally for public work projects such as schools, in the eastern counties of Pennsylvania.

6. BCT contracted with Marjam to supply materials for its subcontract for the construction of Quakertown High School.

7. BCT contracted with Marjam to supply materials for its subcontract with Ehret Construction Company for the construction of the Pine Grove Plaza Shopping Center.

8. BCT was also engaged as the subcontractor for installation of exterior walls and interior metal stud walls and ceilings in the construction of the Tohickon Middle School.

9. On or about April 28, 2000, Mr. Torda signed an Application for Credit as President of BCT on the company's behalf.

10. At the same time, Mr. Torda signed a Continuing Guarantee in his personal capacity. The relevant portion of the personal guarantee states:

> In order to further induce you to sell merchandise on credit, the undersigned jointly and/or severally guarantees the full and prompt payment of any indebtedness of the applicant to Marjam, including finance/late charges in the amount of 2% per month. In the event that legal

       action instituted to enforce payment of the amount pursuant to such extension of credit the undersigned jointly and severally guarantees to be liable for all attorney's fees in the amount of 25% of the balance owed, including all costs and expenses incurred by Marjam for such a situation. In the event of non payment by the referenced business Marjam will be entitled to payment from the undersigned or his heirs, without prior demand or notice and without proceeding against them.

11. BCT faxed to Marjam a request for quotations for steel studs to conform with the plans and specifications approved by the architect for the Tohickon Middle School project.

12. BCT requested a quotation for 20 gauge studs for the interior walls.

13. For the exterior walls, BCT requested a quotation for two separate stud sizes: 12 gauge with 3" flange size and 18 gauge with 2" flange size.

14. BCT specified that the manufacturer of the studs had to be a member of the Steel Stud Manufacturers Association ("SSMA").

15. Marjam sent a written quotation for the materials requested by BCT.

16. Marjam's quotation did not include 12 gauge studs with a 3" flange.

17. Subsequent to April 28, 2000, BCT orally ordered and received building supplies from plaintiff.

18. The studs for the interior walls delivered by Marjam and installed by BCT were 22-25 gauge.

19. The studs for the exterior walls had a 1 5/8" flange size.

20. The studs supplied by Marjam for the interior walls were manufactured by Super Stud.

21. Super Stud is not a member of the SSMA.

22. Plaintiff has claimed the following balances due and owing:

    a. Tohickon Middle School: $166,932.74

    b. Pine Grove Plaza: $44,784.85

23. The total principal balance claimed by plaintiff is: $211,717.59.

24. Plaintiff claims interest from the date suit was filed.

25. Plaintiff claims a 25% attorney's fee in the sum of $55,132.63, as set forth in the credit agreement and personal guarantee.

26. The total sum claimed by plaintiff is $272,781.18 plus interest from June 20, 2002.

27. In its counterclaim, defendant claims damages in the amount of $204,183.00 for the Tohickon project and $60,000.00 for Pine Grove Plaza.

28. Defendant claims that it was required by the contractor to expend $270,354.68 to retrofit the installed studs to conform to the architect's plans and specifications; specifically, BCT was required to "marry" 18 gauge studs to each of the studs provided by Marjam for the interior walls, which gave rise to costs for materials, equipment, wages, supervision, and engineering.

**DISCUSSION**

Marjam originally claimed a balance due and owing for materials at Quakertown High School. There being no evidence to support this claim, Marjam voluntarily withdrew it.

The second project for which Marjam claimed an unpaid balance was the Pine Grove Plaza Shopping Center. Marjam claims that BCT ordered and Marjam supplied doors and hardware for installation. Marjam claims that it is owed $44,784.85 for these goods. BCT contends that Marjam failed to supply the doors and hardware in a timely manner, so construction was substantially delayed. BCT counterclaims in the amount of $28,280.00 for damages caused by the delay.

There was a valid contract between BCT and Marjam for the supply of doors and hardware for the Pine Grove project. The contract did not specify a time for delivery of the goods. Section 2-309(1) of the U.C.C. provides that unless otherwise agreed, the time for delivery shall be a "reasonable time." What is reasonable will vary depending on such factors as the nature of goods to be delivered, the purpose for which they are to be used, the extent of seller's knowledge of buyer's intentions, transportation conditions, the nature of the market, and so on. See e.g., Kutner-Goldstein Co. v. Workman, 112 Cal. App. 132 (1931).

There was some evidence the ordered goods were not delivered in the manner BCT desired, but not that the time Marjam took to

provide the goods was unreasonable as a matter of law.  None of the delays was serious enough to preclude payment.  Therefore, Marjam is entitled to the amount due and owing under the contract for the goods provided for the Pine Grove Plaza project, in the amount of $44,784.85.  BCT is entitled to nothing under its counterclaim for this project.

The third project for which Marjam claims an unpaid balance is the Tohickon Middle School construction.  BCT ordered from Marjam steel studs for the interior and exterior walls in accordance with the architectural plans submitted to Marjam.  For the exterior walls, BCT requested a quotation for two separate stud sizes: 12" with 3" flange size and 18" with 2" flange size.  For the interior walls, BCT requested a quotation for 20 gauge studs.  BCT further specified that the manufacturer of the studs had to be a member of the Steel Stud Manufacturers Association ("SSMA").  Marjam provided quotations for the studs requested by BCT, with the exception of the 3" flange.  BCT accepted that these quotations would apply to its orders.

After the studs were delivered and BCT installed them, the contractor, Ehret Construction Company, discovered that they did not conform to the contract.  The exterior wall studs had flanges of 1 5/8 inches instead of either 2 or 3 inches as specified.  The interior wall studs were 22 or 25 gauge, rather than 20 gauge as specified.  In addition, the interior wall studs were manufactured by Super Stud, Inc., which was not a member of the

SSMA. BCT argues that is not required to pay for the non-conforming studs; it counterclaims in the amount of $270,354.68 for costs BCT incurred in replacing the studs to conform with the architect's specifications as demanded by the contractor.

Marjam contends that there was no contract for 3 inch flange studs. In supply contracts such as this, the price quotation constitutes an offer if it sets forth sufficient detail and a contract can be formed by acceptance of its terms. See White Consol. Indus., Inc. v. McGill Mfg. Co., 165 F.3d 1185, 1190-1191 (8th Cir. 1999). The request to proceed constitutes the acceptance. The initial request for quotation is not an offer and does not provide the terms of the contract. Although BCT initially requested a quotation for 12 gauge, 3 inch flange material, Marjam did not provide a quotation for that size. Marjam did not contract to provide 12 gauge, 3 inch flange studs and BCT is not entitled to damages resulting from Marjam's failure to provide them.

Marjam is entitled to payment for the 1 5/8 inch flange material, although non-conforming, because BCT failed to reject it on delivery and used it in the project. According to the testimony of Marjam's president, Mr. Iosefson, the amount owed for the exterior wall studs is $150,374.16.

With respect to the studs for the interior walls, Marjam claims that the 22-25 gauge studs it delivered to BCT were within the acceptable industry standard for 20 gauge. The court finds

that the interior wall studs failed to conform to the contract.

However, U.C.C. § 2-606 provides that a buyer accepts the goods if, after reasonable opportunity to inspect, the buyer signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity, or if the buyer fails to make an effective rejection.  Once the buyer has accepted the goods, he no longer has the right to reject them as non-conforming.  By installing the studs in the building, BCT signified to Marjam either that the goods were conforming or that it would accept them in spite of their non-conformity.  BCT did not inspect the studs before installing them to verify that they were 20 gauge, but presented no evidence it lacked reasonable opportunity to do so.  BCT would only have had to measure a sample of the delivered studs before installing them to discover the defect.  By installing them without this inspection, BCT accepted the studs.

BCT's right to reject the studs as non-conforming is further limited by the seller's "right to cure."  U.C.C. § 2-508 provides that when non-conforming goods are delivered, the buyer must afford the seller the opportunity to cure the defect and deliver the proper goods.  BCT failed to provide Marjam with this opportunity.

Although BCT had a reasonable opportunity to inspect the studs to verify they were 20 gauge, it did not have a reasonable opportunity to verify they were manufactured by a member of the

SSMA.  Unlike a simple measurement to inspect the gauge, such a verification would have required a more difficult and time-consuming investigation.  Marjam claims that the SSMA membership requirement was not material to the contract, but failed to present any support for this position.  There is no reason to conclude that this requirement was not material.

U.C.C. § 2-608 gives the buyer the right to revoke acceptance of non-conforming goods if the defect was not discovered because of difficulty of discovery before acceptance or because of the seller's assurances.  Under this provision, BCT is entitled to revoke its acceptance, even after installing the studs, upon discovery that they were manufactured by a company not a member of the SSMA.  BCT is therefore entitled to recover the cost it incurred in reinstalling the studs manufactured by Super Stud at the insistence of the contractor.

Exhibit D-28 shows the total cost at Tohickon Middle School, including both the exterior and interior wall studs, was in the amount of $270,354.68.  The exterior wall studs were manufactured by a member of the SSMA, but the interior wall studs were not.  Mr. Torda, BCT's owner, testified that 30% of the cost of repair was attributed to the interior wall studs.  Therefore, BCT is entitled to recover $81,106.40.

The amount owed Marjam was personally guaranteed by Mr. Torda when applying for credit on behalf of BCT.  Mr. Torda contends that the personal guarantee is invalid because he was

assured by Marjam that it would be stricken.  Mr. Torda's argument is not credible.  It would have been unreasonable to sign a guarantee with an assurance that it would be stricken. See Dilworth Paxson v. Asensio, 2003 U.S. Dist. LEXIS 7719 (E.D. Pa. May 5, 2003) (Robreno, J.) (client was a sophisticated businessman and his reliance on a promise not to enforce arbitration clause was unreasonable).

Torda's testimony that he was assured this clause would not be enforced is also barred by Pennsylvania's parol evidence rule. The parol evidence rule provides:

> Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, ... evidence of negotiations leading to the formation of the agreement is inadmissible to show an intent at variance with the language of the written agreement.

Goldstein v. Murland, No. CIV. A. 02-247, 2002 WL 1371747, at *2 (E.D. Pa. June 24, 2002) (Padova, J.).  The signature and guarantee are valid.

Torda claims it was signed for Pine Grove only and did not apply to goods ordered for Tohickon, but it was clearly a continuing guarantee applying to all future extensions of credit to BCT.

Marjam's claim includes damages for legal fees at 25% and interest at 2% per month against Mr. Torda.  The personal guarantee, signed by Mr. Torda individually, contains a clause that in the event legal action is instituted to enforce payment, he will be liable for attorneys' fees in the amount of 25% of the

balance owed and 2% interest per month.

Although the general "American Rule" requires each party to bear its own attorneys' fees, parties may contract to permit recovery of fees and a federal court will enforce such an agreement. Dorazio v. Capitol Specialty Plastics, Inc., 2003 WL 1145408 (E.D. Pa.). Marjam is therefore entitled to recover attorneys' fees in the amount of 25% of Marjam's total award, $195,159.01 minus the amount BCT is awarded in its counterclaim, $81,106.40, from Mr. Torda individually. 25% of $114,052.61 is $28,513.15.

Marjam is also entitled to pre-judgment interest dating from the time suit was filed, May 15, 2002. Generally, there is a legal right to prejudgment interest on money owing upon a contract. Land O'Lakes, Inc. v. Zelenofske, Axelrod & Co. Ltd., 43 Pa. D. & C. 4th 192 (1999). When determining a party's right to interest, the Pennsylvania courts follow the Restatement (Second) of Contracts § 354, which states that prejudgment interest is recoverable "if the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value." Restatement (Second) of Contracts § 354(1). Since the amount Marjam is owed is readily ascertainable, Marjam is entitled to prejudgment interest in the amount set forth in the personal guarantee signed by Mr. Torda. Marjam is entitled to 2% of $114,052.61 per month from May 15, 2002, or $30,414.00.

Any facts in this Discussion section not found in the Facts section are incorporated by reference therein.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this action based on diversity of citizenship, 28 U.S.C. § 1332, as the action is between citizens of different states and the amount in controversy exceeds $75,000.00;

2. Venue is proper in this district under 28 U.S.C. § 1391, since the defendants reside herein;

3. Marjam is awarded $195,159.01 against BCT and Mr. Torda on its claim;

4. BCT is awarded $81,106.40 on its counterclaim against Marjam;

5. Marjam is awarded $28,513.15 against Mr. Torda in attorneys' fees;

6. Marjam is awarded $30,414.00 against Mr. Torda in prejudgment interest.